**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 2-17-2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
     PAUL MARAVELIAS            *
                                *    19-cv-487-JL
               v.               *    October 17, 2019
                                *    3:04 p.m.
NEW HAMPSHIRE SUPREME COURT,    *
ET AL.                          *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:


For the Plaintiff:      Paul Maravelias
                        Pro Se



For the Defendants:     Nancy J. Smith, Esq.
                        N.H. Attorney General's Office
                        Civil Bureau



Court Reporter:         Susan M. Bateman, LCR, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  The Court has before it for
 3    consideration this afternoon a motion hearing in civil
 4    case 19-cv-487-JL, Maravelias versus New Hampshire
 5    Supreme Court, et al.
 6            THE COURT:  All right.  We're here on a motion
 7    to dismiss.  It's primarily involving implicating the
 8    Rooker-Feldman doctrine and to an extent judicial
 9    immunity.  I've read your papers.  I'm familiar with
10    your arguments.  I'm happy to hear your oral
11    presentations now.
12            Can you hear me okay?
13            MS. SMITH:  Yes.
14            MR. MARAVELIAS:  Yes, your Honor.
15            THE COURT:  All right then.  It's your motion.
16            MS. SMITH:  Yes.
17            Good afternoon, your Honor.
18            Just to recap our arguments briefly related to
19    Rooker-Feldman, it's our understanding the plaintiff
20    claims that the fee award is not a judicial proceeding.
21    For the reasons that we've stated in our motions, we
22    don't think that's a valid argument.  Rule 23 provides
23    authority for the Court to award attorney fees.
24            And for the cases that we've cited in footnote
25    5 -- the footnote on page 5 indicates that it is a valid
```

1    judicial proceeding.

2              We believe a second argument related to why

3    Rooker-Feldman doesn't apply relates to his argument

4    that Rooker-Feldman doesn't apply because he's

5    challenging the constitutionality of Rule 23 itself.

6              THE COURT:  Yeah, yeah.

7              MS. SMITH:  On that one there's a fairly

8    recent First Circuit case that we cited that points out

9    again that where the challenge constitutionally would

10   still require an end-run around the state court judgment

11   --

12             THE COURT:  Sometimes.

13             MS. SMITH:  -- it doesn't invalidate the

14   Rooker-Feldman doctrine and that is still what -- the

15   relief he's seeking here would require an end run

16   around the --

17             THE COURT:  Well, what about just a

18   declaratory request -- leaving aside the end-run around,

19   because I think you might have a point there.  To the

20   extent the challenge is just an end-run around the

21   order, Rooker-Feldman probably does bar it.

22             But what about just an argument by a citizen

23   who's been impacted, who has standing, as he does, that

24   Rule 23 is just facially invalid?  That's an argument

25   one is entitled to make, and that's not barred by

1    Rooker-Feldman, is it?

2         MS. SMITH:  If it would require the setting

3    aside of a state court judgment, yes.

4         THE COURT:  Well, what if the Court limited

5    its relief.  What if I said today, right -- and I'm not

6    saying I'm going to do this.  I'm just --

7    hypothetically.  What if I said today, well, no, his

8    claims to set aside the order are barred by

9    Rooker-Feldman, he can't bring them, but there still

10   remains a question, right, of the facial validity and he

11   should be entitled to litigate that.  I'm not sure

12   Rooker-Feldman bars that claim.  Just a facial challenge

13   to Rule 23 as violative of the United States

14   Constitution.  Do you agree with me?

15        MS. SMITH:  Yes, if it were totally divorced

16   from the facts of his case, if it was a pure facial

17   validity challenge.

18        THE COURT:  But then he would have no

19   standing.  Then you would say he has no standing,

20   wouldn't you, right?

21        MS. SMITH:  Right.

22        THE COURT:  You're trying to get -- anyway, I

23   think I get your point.

24        MS. SMITH:  I don't think a pure facial

25   challenge is what we have here because it's very

1  dependent on the facts of his case, and now we're back

2  to doing an end-run around the state court judgment.

3          All right.  The third argument we understand

4  him to be making is that it's a void judgment for we

5  believe two separate reasons.  First, that the Court had

6  no authority to award attorney's fees.  However, as we

7  point out in our motion, Part II, Article 73, of the

8  state constitution grants authority to the Court to make

9  rules regarding the administration of all courts.

10          Also in preparing for this I did a little bit

11  more research, and the Supreme Court, the United States

12  Supreme Court has recognized the inherent authority of

13  Courts to award attorney's fees for a number of things,

14  including frivolous conduct and bad faith, which was

15  what Rule 23 addresses.

16          And so it's within the -- the Supreme Court

17  has recognized that inherent authority of Courts.  A

18  case I can give you on that is Marx versus General

19  Revolution Corps, 568 U.S. 371.  I did not write down

20  the year.  I apologize for that.  I think it was a

21  fairly recent case.

22          THE COURT:  I'm familiar with the case.  I am.

23          MS. SMITH:  The second reason he argues it's

24  void is that -- his argument is that for every wrong

25  there must be a remedy.

1          As we point out, his remedy here is that if he

2   wants to appeal a state court judgment or order that's

3   final, his route is to the United States Supreme Court.

4          THE COURT:  Which, by the way, you did

5   petition for cert, didn't you?

6          MR. MARAVELIAS:  Your Honor, just on this

7   limited question before I begin, yes, I did.  In fact, I

8   have a copy.  That was recently denied on October 7th.

9          THE COURT:  All right.  I'm going to give you

10  all the opportunity to speak you want.  Don't worry.  I

11  won't limit you to my questions at all.

12          Go ahead.

13          MS. SMITH:  Okay.  Regardless of his argument

14  that that's a 2 percent shot in the dark, that is the

15  route that is his remedy if he chooses to appeal from

16  the state court order.

17          And his final argument is that it's not

18  ongoing, and for that I will rely on our argument in our

19  papers that it's a final order.  There's no further

20  state court appeal from it, so it is a final decision.

21          The other arguments he raises on the -- he

22  states a claim against the Court itself that we contend

23  is barred by the Eleventh Amendment, and Ex Parte Young

24  does not apply for the reasons we've stated in our

25  pleadings.

1          In regards to judicial immunity, he hasn't

2    pointed to anything where there's a pure absence of

3    judicial authority.  He has argued that Judge Lynn's

4    facial expressions on a number of occasions expressed

5    some type of personal malice toward him.

6          Even if those were true, it doesn't create an

7    absence of judicial authority, and the case law we cited

8    is very clear that judicial authority exists even where

9    there's evidence of bad will.  So we don't believe he's

10   overcome the hurdle of judicial immunity.

11          THE COURT:  Understood.  All right.

12          Sir, how do I pronounce your name correctly?

13          MR. MARAVELIAS:  Maravelias, your Honor.

14          THE COURT:  Maravelias.  Just like it's

15   spelled.  All right.

16          All right.  I just want to make sure you

17   understand.  You're here pro se.  You have every right

18   to be here pro se.

19          MR. MARAVELIAS:  Yes, your Honor.

20          THE COURT:  And I wouldn't dream of

21   interfering with that.

22          I do have to hold you to the rules.  You

23   appear though to be very able to abide by the rules.

24   You seem to have a very good working knowledge of legal

25   process and the law, so I'm not that concerned about it.

1              I just want you to understand we do have

2     rules, the rules of procedure, the rules of evidence.

3     The rules of evidence don't matter for a hearing like

4     this, as you know, but the rules of procedure do.

5              The way I try to usually approach this in a

6     pro se situation is -- I mean, I will enforce the rules

7     as to both parties, but I try to bend over backwards a

8     little bit to make sure a pro se litigant isn't tripped

9     up on a pure technicality in a way that prejudices the

10    proceedings in a case.  Sometimes that's frustrating for

11    counsel, clients like the state and others, but

12    sometimes I do that.

13             The bottom line is I'm just trying to tell you

14    that, you know, I want you to be comfortable, make your

15    arguments, and not worry that it's a sort of a gotcha

16    situation if you had some technical noncompliance with

17    some local rule or something like that.  That's not my

18    intention.  My intention is to apply the rules to you so

19    it's a fair argument but let you do what you want to do

20    and let you make your arguments you want to make.  All

21    right?

22             MR. MARAVELIAS:  Thank you, your Honor.

23             THE COURT:  Sure.

24             Before you get started, you know, I'm familiar

25    with a lot of counsel and litigants that come before the

1    Court, and I'm familiar with Assistant Attorney General

2    Smith.  She's obviously been here many times.

3                Just tell me a little bit about yourself.

4                MR. MARAVELIAS:  Your Honor, may it please the

5    Court, and I want to thank you for that overture.  This

6    is my first time litigating in federal court oral

7    argument.  So if I'm in noncompliance with any

8    procedures or morals, please feel free to correct me.

9                THE COURT:  You're doing fine.

10               MR. MARAVELIAS:  Before we get into the legal

11   merits, to respond to your question, I'm a citizen of

12   New Hampshire.  I've lived here since I was 3 years old.

13   I had the typical New Hampshire upbringing.

14               First of all, I was home-schooled for my

15   pre-high school education.  I went to Windham High

16   School.  I was the first graduating class there.

17               THE COURT:  Yeah.  That's a new school, yeah.

18               MR. MARAVELIAS:  Yes, sir.  It was brand new.

19   I had a phenomenal education there.  I learned about the

20   same constitutional liberties that I'm putting into

21   practice right now there.

22               I then went to Dartmouth College, and I

23   received a good education there.  But to be honest, I

24   was a B student there because I founded my own software

25   business online.

```
1              THE COURT:  Well, that doesn't mean much.

2              Did you graduate?

3              MR. MARAVELIAS:  Yes, sir.  2017.

4              THE COURT:  What degree?

5              MR. MARAVELIAS:  I was an economics major.

6              THE COURT:  Excellent.

7              MR. MARAVELIAS:  And then in 2016 I asked to

8    go out to dinner for the first time in my life, we were

9    family friends, and her father had this huge explosion

10   towards me, and he's this rich man in town.  He wound up

11   getting a stalking and restraining order against me

12   based upon a verifiable falsehood that -- there's an

13   audio recording, an illegal RSA 570 wiretapping

14   recording.  It's illegal I found out to record your own

15   conversations --

16             THE COURT:  You have to slow down a little

17   bit.  She's having difficulty keeping up with you.

18             MR. MARAVELIAS:  My apologies.

19             THE COURT:  That's all right.  Just speak a

20   little slower.

21             MR. MARAVELIAS:  Yes, sir.

22             The legal relevance is all of this litigation

23   ironically enough goes back to that incident back in

24   2016 where this family pursued a patently false stalking

25   and restraining order against me which still exists to
```

1  this day.

2          And there are some interesting happenstances

3  at the New Hampshire Supreme Court that -- I want to

4  stay very disciplined to this appeal, excuse me, to this

5  case, but there are concerns that have overlapped into

6  this case with regards to their blanket affirmnesses

7  (sic) and then self-censoring said orders from the

8  website, sir.

9          They actually -- I did some judicial research.

10  The New Hampshire Supreme Court since 2018 has been

11  self-censoring and publishing nowhere their final

12  dispositions in deviant stalking orders, and over 6,000

13  such petitions were filed in the year 2018, and they

14  granted in the year 2018 zero reversals for stalking

15  orders and a grand total of two reversals for deviant

16  protection orders.

17          THE COURT:  I see.  You think that establishes

18  a problematic pattern?

19          MR. MARAVELIAS:  Yes, sir.  And I think that

20  it ties into some of the aspects here that I'll discuss.

21  I think if I went into further detail about the stalking

22  matter on the unrelated appeal, that's briefly mentioned

23  in the procedural history there, I think that would sort

24  of exceed the bounds of this proceeding.  And I'm

25  already thankful enough for your invitation to give me

1    some background information that I don't want to abuse

2    that grace that you've given me.

3              So if that's pleasing to you, sir, I would

4    progress into the legal argument.

5              THE COURT:  Yeah.  I think -- okay.  That's

6    fine.

7              By the way, you can do it standing, you can do

8    it sitting, whatever makes you most comfortable.  If

9    you're more comfortable sitting so you can see your

10   notes or whatever, I have no problem with you speaking

11   from a seated position.

12             The other thing is this.  Look, in oral

13   argument I try to engage counsel, ask questions, and

14   I'll do the same with you.  I hope I don't give you any

15   facial expressions or give you an idea that I've

16   prejudged your case.  I haven't prejudged your case at

17   all.  I want to give you a fair and impartial hearing

18   here today.

19             So, please, if I say something or do something

20   that gives you distress, just point it out and I'll do

21   my best to stop.  All right?

22             MR. MARAVELIAS:  Thank you, your Honor.  I

23   appreciate that.

24             I also openly invite Attorney Smith to

25   interrupt at whatever time.  I understand oral argument

1   is an opportunity for the Court to do service, not just

2   to repeat your pleadings that you've already read.

3            THE COURT:  Sure.

4            MR. MARAVELIAS:  So thank you, your Honor.

5   May it please the Court.

6            I would like to at the outset sort of give

7   sort of a 300-foot view here that I think there's four

8   potential dispositions in this motion to dismiss.  There

9   are the extreme cases, denied in full or it's granted in

10  full, but I think that there are two significant

11  intermediary dispositions.

12            And in full disclosure I want to completely

13  make it fully clear that my claim in my amended

14  complaint for monetary damages against Robert Lynn in

15  his individual capacity, that's probably the most

16  assailable claim for relief in my complaint.

17            THE COURT:  I think you're right about that,

18  yeah.

19            MR. MARAVELIAS:  And I believe I have a strong

20  legal argument under the law for the validity of that

21  claim, but I wanted to point out that there were

22  intermediary dispositions here where I've failed to show

23  -- I do agree.  I just --

24            THE COURT:  So the two extremes are of course

25  full denial and full grant.

1              MR. MARAVELIAS:  Yes, your Honor.

2              THE COURT:  What are the two -- just before

3     you explain them, what are the two intermediary

4     positions?

5              MR. MARAVELIAS:  Assuming that I fail to

6     establish that the Chief Justice of the New Hampshire

7     Supreme Court voided his judicial immunity, the Court

8     will then have to deny my claim for monetary damages

9     against Justice Lynn.

10             However, my claims for the declaratory relief

11    as it pertains to what I've called this fraudulent

12    extortion conspiracy which limits a public citizen's

13    access to the role of the appellate court and my generic

14    facial challenge against Rule 23 would remain.

15             The secondary intermediary disposition which

16    would be even more favorable to the defendants was if I

17    fail also to show that the Rooker-Feldman doctrine does

18    preclude the relief that I request in the first and

19    second prayers for relief of my amended complaint, which

20    is for declaratory relief on all prevalent counts and

21    injunctive relief.

22             In such a case only the facial challenge

23    against Rule 23 would remain.  Perhaps that's a good

24    thing for me to open with.

25             I, off the bat, fully agree with Attorney

1  Smith that in order for me to bring a facial challenge

2  under Rule 23, if and assuming that my other as applied

3  challenges are precluded, you know, set aside by the

4  Rooker-Feldman doctrine, I agree that that has to be

5  distinct and divorced from the particular facts and

6  circumstances of my case.

7          THE COURT:  Okay.

8          MR. MARAVELIAS:  But the evident fact is my

9  amended complaint does not refer to specific facts and

10  circumstances when it comes to my facial challenge at

11  the end.

12          And for judicial economy instead of filing two

13  separate lawsuits, one about probably the biggest thing

14  I want to get into, the Rooker-Feldman issue with the

15  particular ongoings with me, and another lawsuit because

16  I have standing to bring that facial challenge, for the

17  purposes of judicial economy was worthwhile to combine

18  those, also seeing if they were borne out of the same

19  transaction of occurrences.  So that's why I combined

20  those there.

21          So I believe that the First Circuit's recent

22  clarification in -- I believe it was -- it was the

23  Massachusetts case.  It was I think Tracey versus

24  Massachusetts.  That is distinguishable, I think that's

25  the case that Attorney Smith was citing, because in that

1   particular case I think that there was an attempt to

2   bring a facial challenge that was not divorced from the

3   particular facts and circumstances of what happened with

4   that particular litigant.  It was challenging to go

5   heads up against a final state court judgment.

6           With that in mind, I would like to proceed

7   first with the Rooker-Feldman question.  It seems like

8   that's what is probably the most contentious issue here.

9           THE COURT:  I think it is.  And I'm going to

10  be honest with you, and I want to hear your argument,

11  but I do think that presents a big problem for not all

12  your claims but a good chunk of them, so you should

13  address it.

14          MR. MARAVELIAS:  Thank you, your Honor.

15          I think the first important principle to

16  elucidate understanding why my claim survives this

17  motion to dismiss is understanding the difference

18  between original jurisdiction and appellate

19  jurisdiction.

20          So assuming that the New Hampshire Supreme

21  Court's order that awarded $4,900 to my opponent months

22  after this appeal was completely adjudicated on the

23  merits and done, assuming that that is not a void

24  judgment, the relief I am requesting is not seeking an

25  appellate reversal of that.

1          Federal courts have recognized that there's a

2    difference between obtaining a declaratory adjudication

3    that a certain act, and in particular the enforcement,

4    the prospective potential enforcement of an order would

5    be a violation of federal constitutional rights.  They

6    have distinguished between that, declaratory relief, and

7    a different prayer for relief which would amount to an

8    appellate reversal.

9          As you can see in my amended complaint, there

10   is very, very specifically and intensionally no request

11   that this Court command an officer of the state supreme

12   court to issue an order undoing their order dated March

13   29, 2019.

14         The order dated March 29, 2019, was an order

15   which patently deprived me of federal constitutional due

16   process protections because they did not afford me any

17   opportunity whatsoever to respond to this fraudulent

18   itemization.  And there's case law, very persuasive case

19   law, that distinguishes between --

20         THE COURT:  What prevented you?  I mean, there

21   was a motion for it.  There was a motion for

22   reconsideration.  What stopped you from presenting

23   anything you wanted to present?

24         MR. MARAVELIAS:  Here's why, your Honor.

25   Because procedurally there was an order that just

1   blanket granted in one sentence the request for

2   appellate attorney's fees.

3            THE COURT:  Yes.

4            MR. MARAVELIAS:  Let's forget about -- let's

5   assume -- let's just forget about commenting on how

6   unjust that was.  Let's just assume that that's true.

7            THE COURT:  Yeah.

8            MR. MARAVELIAS:  And then -- that order was

9   dated on February 21st.  In that order the defendants,

10  the New Hampshire Supreme Court, signaled the opposing

11  party's counsel to itemize the fees he is seeking by

12  March 4th.

13           The New Hampshire Supreme Court has a rule,

14  it's Rule 22, that motions for reconsideration must be

15  within ten days of the date of the order.

16           I could not have possibly filed a -- I could

17  not have known in the future what the opposing party was

18  going to enumerate in their expenses in their

19  outrageously surreptitious and metastasized itemization

20  that went from the $500 limited sanction -- it was all

21  about -- the relief granted was just for one allegedly

22  frivolous motion to strike, and then all the sudden this

23  strident attorney completely itemizes every --

24           THE COURT:  No, I looked at their request for

25  fees.  They didn't ask just for a motion to strike.

1    They asked for the whole appeal.

2             MR. MARAVELIAS:  It's in paragraph 23 of their

3    motion, your Honor.  I highlighted the paragraph.

4             THE COURT:  There's other parts of their

5    motion that make it clear that they're asking for relief

6    from the entire -- to have their fees paid for the

7    entire appeal.

8             I realize there are paragraphs that refer only

9    to motion to strike, but I mean, I can cite you the

10   paragraphs, too.  I think you know them better than I do

11   though.

12            Are you saying that there's no way to

13   interpret that as a request for all their fees for the

14   appeal?  Because I think there is.

15            MR. MARAVELIAS:  I would say that I would, but

16   even if I'm wrong, I have additional fallback positions.

17            THE COURT:  Yeah.

18            MR. MARAVELIAS:  Number one, assuming that the

19   language was clear that they were seeking fees for the

20   entire appeal, I still have a constitutional due process

21   right to be heard in response to their itemization still

22   because I have to have a say here.

23            The Constitution, the Fourteenth Amendment,

24   requires a state will not exercise control of my

25   property without a reasonable opportunity to be heard.

1          THE COURT:  What stopped you from contesting

2    your itemization?

3          MR. MARAVELIAS:  The New Hampshire Supreme

4    Court's denial of my motion and denial for an

5    evidentiary hearing.

6          I cited case law in my amended complaint where

7    a question of law -- where a question revolves around a

8    matter of fact, did I behave frivolously, was my appeal

9    frivolous.

10          There are thousands of these petitions filed,

11    many appeals.  I was probably the only person in the

12    state of New Hampshire ordered to pay for filing an

13    unsuccessful restraining order petition.  That's an

14    extremely untenable position.

15          In fact, my original state court case --

16          THE COURT:  You weren't ordered to pay for

17    that.  You were ordered to pay for the fees on appeal.

18          MR. MARAVELIAS:  I was both, your Honor.

19          THE COURT:  Both?

20          MR. MARAVELIAS:  I was both.

21          And the fact that the New Hampshire Supreme

22    Court in the underlying matter upheld the $9,000 I had

23    to pay my attorney, excuse me, the opposing party's

24    attorney, even though the trial court, the local judge,

25    included a cost in the $9,000 which was

1    unquestionably --

2            THE COURT:  Outside the scope, yeah.

3            MR. MARAVELIAS:  -- outside the scope.  So

4    that renders a disposition I received at the New

5    Hampshire Supreme Court at least partially successful,

6    because that small extraneous cost which was

7    undisputedly in error, and the opposing party actually

8    waived that, so that renders my appeal patently as a

9    matter of law nonfrivolous.

10           However, let's assume that it could be argued

11   if I didn't have that aspect on my side that it is

12   potential my appeal was frivolous, which I'm the only

13   appellate in the 143-year modern history of the New

14   Hampshire Supreme Court to be ordered to pay an

15   opponent's, a pro se appellant, entire fees, but let's

16   assume.  I still had a constitutional right under the

17   Fourteenth Amendment to present my evidence, mine to be

18   heard, on the aspect of not being frivolous and to

19   contest the itemization.

20           When I raised those federal constitutional

21   issues, they ignored them.  They did not adjudicate them

22   positively or negatively.

23           And there's an interesting piece of case law

24   that Attorney Smith cited.  She said that generally it's

25   assumed that factfinders perform other requisite

1    findings of fact to support a judgment.

2              THE COURT:  Right.

3              MR. MARAVELIAS:  However, when the original

4    tort feasor is the state's highest court exercising

5    original factfinding jurisdiction, that does violate the

6    equitable maxim because if it is acceptable for trial

7    court judges to command away people's rights without

8    a -- people's monetary property without a right to trial

9    by jury -- if you sued me for $9,000, oh, you know,

10   frivolous litigation, blah, blah, blah.  If you sued me

11   for $9,000, that goes to court, that goes to a trial,

12   and I would have a right to a trial by jury on such a

13   claim.

14             A court that is supposed to fulfill only an

15   appellate function cannot simply cite the bald assertion

16   that a certain rule exists without making particularized

17   finding of facts and affording the litigants a fair and

18   full opportunity to be heard on those facts.  Especially

19   where no higher court in the state system exists, A, and

20   especially whereas the United States Supreme Court in

21   its certiori --

22             THE COURT:  I have to ask you this.  Do you

23   really think the United States Supreme Court is going to

24   tell the highest courts of every state in this nation

25   that it can't assess costs and fees against vexatious or

1   bad faith litigants without making specific findings

2   regarding every dollar or charge or itemized expenditure

3   on litigation?  That just doesn't seem likely to me at

4   all.

5           MR. MARAVELIAS:  I didn't go for that bold of

6   an argument.

7           THE COURT:  Okay.

8           MR. MARAVELIAS:  The argument can be much more

9   conservative.  The argument can simply be that an

10  appellate court when it attempts to exercise original

11  jurisdiction and make an appropriation of someone's

12  monetary property, you have to be granted a meaningful

13  opportunity to be heard.

14          And by denying my evidentiary hearing and by

15  commanding the opposing party to -- or allowing them to

16  file an itemization after my ten days, which is my only

17  opportunity to file a motion for reconsideration, I was

18  deprived of any opportunity to respond to the content of

19  that itemization and to dispute.

20          THE COURT:  Why couldn't you just file an

21  objection after they filed their itemized list, and then

22  once the order came of the -- once the order to pay

23  came, right, the order for attorney's fees, you could

24  move to reconsider that and submit evidence that -- I'm

25  struggling with the idea that you didn't have an

1    opportunity to be heard and noticed.  You did.  I mean,

2    I don't think the rules barred you from objecting to

3    either, A, the itemized list, or B, the order that

4    resulted.  You could have contested that.

5           MR. MARAVELIAS:  I understand the distinction

6    you're trying to make.  Rule 22 of the New Hampshire

7    Supreme Court states that consecutive motion

8    considerations will not be even heard.

9           Now, I understand you can be hyperliteral and

10   say that, well, the order that was technically approving

11   the granting of the fees is a distinct order.  However,

12   I will say if that's true, a person of reasonable

13   intelligence reading the one sentence cursory orders of

14   the New Hampshire Supreme Court would not necessarily

15   come to the understanding and that enters a territory of

16   vagueness that you cannot reasonably expect a pro se

17   litigant to entertain.

18          Number two, I would --

19          THE COURT:  Yeah, that goes to your facial

20   challenge, but go ahead.

21          MR. MARAVELIAS:  Yes.

22          Number two, I would also say that regardless

23   in any case, even though I did submit the evidentiary

24   materials, my original objection to the motion for

25   attorney's fees, that they denied that, excuse me, that

1    they did not even look at that or consider the fact that

2    my appeal was patently nonfrivolous because of the small

3    amount that --

4              THE COURT:  That part they waived?

5              MR. MARAVELIAS:  Yes.

6              So that in and of itself renders any legal

7    holding, which there was none, that my appeal was

8    nonfrivolous false.

9              Assuming that the New Hampshire Supreme Court

10   made a false holding that was a valid judgment, which I

11   dispute -- I want to talk about that in a second.

12   Assuming it was a valid judgment, how come every single

13   other litigant against whom a civil judgment for a fine

14   was levied has a right, a right to an appeal to a higher

15   court?  This is where the equitable maxim comes in.

16             THE COURT:  We don't have a higher court.  The

17   state of New Hampshire doesn't have a higher court.

18             MR. MARAVELIAS:  Exactly.  That's my argument

19   for why this Court, even if it is like an actual

20   judgment that would be subject to the Rooker-Feldman

21   doctrine, which I'm going to argue it's not, even if it

22   were, the principles of federalism behind animating the

23   Rooker-Feldman doctrine are not violated when the courts

24   have not in and of themselves established a proper

25   appellate process that every single other litigant gets

1    to enjoy when fines and fees are levied against them to

2    a normal civil lawsuit, not by filing a motion in a dead

3    appeal -- this appeal was done for months, that's

4    another aspect -- but by filing a claim in civil court,

5    the lower court.

6              That is why the equitable maxim --

7              THE COURT:  Slow down.

8              MR. MARAVELIAS:  -- compels this Court to hear

9    the claim under the federal constitution because the

10   current arrangement of the United States Supreme Court

11   certiorari jurisdiction has been held not to be

12   repugnant against the due process rights that every

13   citizen enjoys only because of the understanding that if

14   something potentially violates your rights from state

15   court, the state courts are afforded full trust in faith

16   and credibility under the full faith and credit clause

17   to adjudicate those federal claims to the Constitution

18   through an appellate process.

19              And here in my case we have an extraordinarily

20   rare, unprecedented in my research, instance where in

21   their subjective frustration with me, and I have lots of

22   objective proof that in the retaliation claim they

23   usurped a months finished appeal case which they

24   adjudicated and brought to a final order on the merits

25   without the slightest assertion of triviality.  Neither

1   the opposing party, neither the trial court warranted

2   this to be a frivolous appeal, but they denied me the

3   same rights that every other person in the state courts

4   would have been given if a claim against the monetary

5   property were made in an appropriate forum that given

6   the extraordinary procedural realities of this chain of

7   events I did not have.

8            And that's assuming it is a final state court

9   judgment.  That's why the Rooker-Feldman doctrine given

10  its philosophy.  However, that -- I would appreciate --

11  I think it would be easier for all of us if we didn't

12  have to go down that route because that would

13  potentially require a novel interpretation of the

14  Rooker-Feldman --

15           THE COURT:  Go down what route?

16           MR. MARAVELIAS:  The route --

17           THE COURT:  Of finality?

18           MR. MARAVELIAS:  No.  The route -- well,

19  that's a separate aspect, but the route of -- assuming

20  that I'm complaining about actual valid state court

21  judgments that are judgments and are not void, but

22  however, understanding that the jurisdictional

23  underpinning and philosophy of the Rooker-Feldman

24  doctrine does not apply in this case when there is no

25  appellate recourse in the state courts because it's the

1    state's highest court that went from acting as --
2    exercising appellate jurisdiction to original
3    jurisdiction.
4            Now I'll take it even a step further and say
5    you don't even have to consider that argument because --
6            THE COURT:  Slow down.
7            MR. MARAVELIAS:  -- the orders that I seek
8    declaratory relief violated my constitutional rights are
9    not state court judgments, nor are they final state
10   court judgments.
11           First, let me talk about the judgments.  The
12   legal --
13           THE COURT:  Aren't they judgments about
14   whether you litigated in bad faith?  How are they not
15   final?  What's not final?
16           MR. MARAVELIAS:  So there's finality and the
17   judgments.  I'll address the finality first.
18           So the Rooker-Feldman doctrine finality test
19   was clarified by the First Circuit in the case from
20   Puerto Rico, and there's three prongs in my memorandum.
21   Both parties are seeking further actions.  We have
22   pending motions for contempt against each other on the
23   docket there.
24           THE COURT:  If that were the law, there would
25   never be a final judgment.  Filing a post-trial

 1   post-judgment motion doesn't make a judgment any less

 2   final.

 3            MR. MARAVELIAS:  Here's the distinction.  When

 4   it's typically -- with the Rooker-Feldman doctrine it's

 5   about final state court judgments on the merits of a

 6   legal case, and each court has a rule, trial courts

 7   especially, that, okay, after 30 days --

 8            THE COURT:  You have to -- look, she can't

 9   keep up.

10            MR. MARAVELIAS:  Sorry.

11            THE COURT:  I know, but respectfully, it's

12   about -- it's got to be about the twentieth time.

13            You're going to have to speak slower or I'm

14   going to have to decide this on the papers.  She can't

15   get hazard pay, right?  I don't want anyone to get hurt

16   doing this.

17            You've got to dial it down somehow.  And I

18   mean that respectfully because you're very articulate,

19   and I speak too fast all the time in court so I get it,

20   but I can't have you even unintentionally abusing the

21   court reporter.  You've got to take it slow.

22            Now, here's the thing.  It is a final

23   judgment.  They moved for attorney's fees on your --

24   based on your conduct in the court.  You had an

25   opportunity to object.  That's the decision.  That's how

1  it works.

2          The fact that there's -- it happens here all

3  the time.  We get motions all the time forever on cases

4  that are closed.  It doesn't make them any less final.

5          The supreme court had litigation over your

6  conduct, a motion was filed, an objection was filed, the

7  Court makes a decision.  There's a motion for

8  reconsideration.  There's an opportunity to argue about

9  it.  There's a decision.

10          I can't imagine why you think that lacks

11  finality.

12          MR. MARAVELIAS:  So there's two aspects.

13  Let's assume it's final.  It's on a judgment.  Rule 23

14  particularly says, as a matter of discretion but not of

15  right.  In Blacks Legal Dictionary the definition of a

16  judgment is a pronouncement by a court of law upon the

17  liabilities and rights of the individual parties.

18          Since Rule 23 specifically --

19          THE COURT:  You don't think -- I know it's a

20  matter of discretion, but there's lots of matters of

21  discretion.  The rules establish a right to recover

22  attorney's fees for bad faith frivolous litigation.

23  It's an entitlement that one may request and the Court

24  may grant.  It's certainly a right that's afforded to a

25  litigant to seek that relief, and it was afforded in

1    this case.  The fact that it required the exercise of

2    discretion doesn't make it any less a judgment.

3               What's the authority for that proposition?

4               MR. MARAVELIAS:  Blacks Legal Dictionary.

5               THE COURT:  Yeah, I get it.  Okay.

6               MR. MARAVELIAS:  Let's assume I fail on that

7    argument.  Let's assume it was a judgment and it was

8    final.  I still would have a right to relief in this

9    court because of the extraordinary nature of not having

10   an appellate recourse, A, and because of the nature that

11   I was not afforded an evidentiary hearing.

12              THE COURT:  What do you mean you don't have

13   any appellate recourse?  You filed for a cert. petition

14   in the United States Supreme Court.

15              MR. MARAVELIAS:  Yes, but that doesn't satisfy

16   the equitable maxim because it's not an appellate remedy

17   by right.  So that introduces an equal protection issue

18   with the Fourteenth Amendment that --

19              THE COURT:  Is this only because the supreme

20   court vis-a-vis a motion for fees is like a factfinding

21   court, because under that theory -- there is no appeal.

22   It's the highest court in this state.  They issue

23   rulings constantly to which there is no recourse.  It

24   happens all the time.

25              That doesn't mean a Rooker-Feldman doctrine

1  doesn't apply to their decisions.  I don't understand

2  the argument.  There's no appeal from the New Hampshire

3  Supreme Court, I know.  There is appeal from the New

4  Hampshire Supreme Court for example on habeas corpus.

5  That's because the United States Congress has created

6  that right.  They haven't done that here.

7           Do you understand what I'm saying?

8           MR. MARAVELIAS:  I want to argue that they

9  have under 20 U.S.C. 1331.  I think an original federal

10  question jurisdiction requires that the original tort

11  feasor violated my due process rights under color of

12  state law.  So I would argue that Title 42 Section 1983

13  provides me a vehicle to pursue civil litigation again.

14           THE COURT:  So any state court litigant who

15  pursues relief in violation of state law who doesn't

16  prevail can have it revisited in federal court?  That's

17  your argument?

18           MR. MARAVELIAS:  No.

19           THE COURT:  No?

20           MR. MARAVELIAS:  I would say only if they did

21  not have -- if it's a rare case where they had

22  absolutely no appellate recourse in the state court to

23  those harms, then I would say that that's prohibited.

24  Your only chance is discretionary review under the

25  United States Supreme Court certiorari jurisdiction.

1           THE COURT:  Okay.

2           MR. MARAVELIAS:  But since there was an

3   original federal question that no New Hampshire higher

4   court ever could review, that is why this court's

5   original federal question jurisdiction is not confounded

6   by the Rooker-Feldman doctrine.

7           And I have separate and further grounds, for

8   instance, disputing the definition of a judgment given

9   Rule 23's specific language not as a matter of right.

10          THE COURT:  Yeah.

11          MR. MARAVELIAS:  And on the non-finality and

12  on a couple other things, such as the jurisdictional

13  argument which we didn't even get into.

14          THE COURT:  Look, the way I look at your

15  arguments -- you've got four arguments regarding

16  Rooker-Feldman basically.  Not final, right?  Not a

17  judgment or judicial in nature.  It's void -- it's not

18  just voidable but void from the get-go, and then this

19  idea that you have no remedy.  Those are all -- as far

20  as I can understand your papers, those are arguments as

21  to why Rooker-Feldman doesn't bar your claim.

22          Am I right?

23          MR. MARAVELIAS:  That's correct.  And the fact

24  that there's ongoing action sought in that document.

25          THE COURT:  Ongoing actions what?

34

1          MR. MARAVELIAS:  Sought in that state supreme

2     court docket.

3          THE COURT:  Well, that's what you mean by not

4     final?

5          MR. MARAVELIAS:  Right.

6          THE COURT:  Yeah.  Okay.

7          Listen, I think I understand your

8     Rooker-Feldman.  Talk to me about judicial immunity.

9          MR. MARAVELIAS:  Okay.

10         So the panoply of 1983 case law is very clear

11    that judicial immunity attaches for monetary relief.  So

12    there's no argument that if I fail to demonstrate that

13    Justice Lynn voided his judicial immunity, that my

14    claims for monetary damages must as a matter of law

15    fail.  I agree with that.

16         THE COURT:  Okay.

17         MR. MARAVELIAS:  However, assuming that

18    judicial immunity does attach, it does not preclude my

19    claims for declaratory or injunctive relief.

20         Now, the defendants have cited case law --

21         THE COURT:  Regarding the facial validity of

22    the rule?  Is that what you're talking about?

23         MR. MARAVELIAS:  Not just the facial validity

24    but also --

25         THE COURT:  The Court's action in this case?

1          MR. MARAVELIAS:  Yes.  My declaratory relief,

2     injunctive relief preventing the enforcement.

3          So the United States Supreme Court has

4     recognized the distinction between the enforcement

5     aspect and the commanding a judicial officer to rule

6     different, right?  That's not touching that.  They don't

7     have to do anything.  They just have to refuse -- they

8     just have to, by the relief that I'm requesting, refrain

9     from bringing a criminal prosecution against me by

10    contempt of court which would violate my constitutional

11    protections under the federal constitution of the

12    Supremacy Clause.

13         So with regards to judicial immunity, there is

14    some conflict that you might notice if you looked at the

15    case law, and Attorney Smith did cite one case from 2004

16    in this court which was Macdonald versus Broderick which

17    did -- and there is a quote in there.  The defendants

18    are arguing that basically judicial immunity is not just

19    immunity from monetary damages but it's complete

20    immunity from suit, even declaratory injunctive relief,

21    and my position is that's just simply not consistent

22    with the actual status of 1983 case law.  It's not

23    consistent with the United States Supreme Court's ruling

24    in Pulliam.  I believe I have that case.  It's not

25    consistent with the United States Supreme Court ruling

1   in the Supreme Court of Virginia case, the consumer --

2   that's the one I have cited there.  It has been held,

3   and in fact the federal legislator has acknowledged

4   implicitly in the statute 1983 that declaratory relief

5   can issue against state judicial actors, not federal.

6   That's like Bivens actions and stuff like that.  That is

7   just simply not an accurate contention.

8          Now, insofar as there's a persuasive quote

9   from Broderick versus Macdonald from this court in 2004,

10  number one, that case is distinguishable because Mr.

11  Macdonald made the error of suing the Chief Justice of

12  the Supreme Court of New Hampshire solely in his

13  judicial capacity.  That creates obviously a situation

14  in the Ex Parte Young doctrine where you are really not

15  holding that judge accountable for his individual acts

16  which are sort of separating him from the sovereign

17  entity.

18          I think that that gets us to the Eleventh

19  Amendment argument.  I want to keep it on the judicial

20  immunity.  The end all be all is that judicial immunity,

21  assuming it attaches, does not bar claims for

22  declaratory and/or injunctive relief.

23          THE COURT:  I get the picture there.

24          MR. MARAVELIAS:  Secondarily, judicial

25  immunity does not apply at all.  I have to argue that.

1   That's why I put the monetary relief.  I spent a lot of

2   time and money on this.  I want be reimbursed for that.

3           Simply, the defendants voided their judicial

4   immunity when they separately acted outside the

5   jurisdiction and took acts that amounted to nonjudicial

6   acts.

7           We talked about the lateral argument that came

8   up in the Rooker-Feldman.  This is actually very

9   connected to the Rooker-Feldman because if I could show

10  that the judicial immunity was voided under either of

11  these two possibilities, that would also automatically

12  resolve the Rooker-Feldman issue because the case law is

13  clear Rooker-Feldman does not apply to void judgments

14  that were actually jurisdictional or were nonjudicial.

15          So I think I already said my argument for why

16  it wasn't judicial.

17          THE COURT:  You did.

18          MR. MARAVELIAS:  Because the rule says it's

19  all a matter of right.

20          It's not -- it's actually jurisdictional

21  furthermore because there's -- so there's two aspects of

22  authorization for the existence and powers of the New

23  Hampshire Supreme Court, statutory -- RSA 494 which

24  clarifies it's an appellate court.  It's not a court

25  which -- I mean, yes, if there's an extraordinary case,

1  you can petition for original jurisdiction.  That's not

2  what happened here, right?

3           THE COURT:  Yep.

4           MR. MARAVELIAS:  Typically in New Hampshire if

5  you have a claim against someone if they injured you by

6  filing a frivolous appeal or imagine some conduct, you

7  make either a small claims, or, if it's over a certain

8  amount --

9           THE COURT:  Slow down, please.

10          MR. MARAVELIAS:  -- in the superior court.

11          So when it came to what happened in this case,

12  it -- yeah, so the jurisdiction.  The New Hampshire

13  Supreme Court is allowed by constitutional enactments

14  that were amended in the '60s and '70s, not Article 73

15  but 62 -- so 72(a) and 73(a) that said, well, the Chief

16  Justice of the New Hampshire Supreme Court is able to

17  create rules, such as how do we handle frivolous

18  litigants, and making the rules that are with the

19  consensus of the majority of the justices for overseeing

20  the administration of the courts.

21          And I'm in full agreement that every state

22  court, as far as I know, has some sort of rule about

23  frivolous conduct, and those rules are very, very

24  distinguishable from the New Hampshire Supreme Court's

25  defective constitutional facial rule, that's separate,

1   and let's assume that that's completely valid and

2   jurisdictional.

3          Well, what happened in this case was not even

4   an exercise of Rule 23, because Rule 23 clearly states

5   that there has to be -- after a finding that the appeal

6   was frivolous or in bad faith, the Court can award

7   attorney's fees.

8          Well, there was no finding, and the New

9   Hampshire Supreme Court negated their ability to make

10  such a finding by failing to make any remote suggestion

11  that my appeal itself was frivolous.  Even if it did,

12  that would be repugnant to the Supremacy Clause of the

13  United States Constitution if the New Hampshire

14  Constitution allowed the state supreme court to

15  selectively penalize certain state appellants for their

16  only state appellate recourse simply because it makes a

17  bald assertion, unqualified and even without the

18  litigant being -- a full opportunity to be heard, that

19  his appeal, which was patently necessary, was frivolous

20  or in bad faith.

21         So since they never made --

22         THE COURT:  What do you mean patently

23  necessary?

24         MR. MARAVELIAS:  That's the reference.  It was

25  patently necessary and not in bad faith, my appeal,

1    because of that extra cost in the lower case matter.

2              So they waived that cost.  I did enjoy limited

3    success on that appeal.  There was a cost --

4              THE COURT:  I'm just curious, and I don't

5    think this matters, but at the lower court level did you

6    ever challenge that extra outside of the time frame

7    cost?  Did you do a motion for reconsideration or --

8              MR. MARAVELIAS:  Oh, yes.  At the lower trial

9    court level when the judge, A, made up a nonexistent New

10   Hampshire law case supporting the attorney's fees award.

11   This is different.  This is the original attorney's fees

12   award for my restraining order petition which was very

13   -- completely factually supported.

14             I just want to add, to me it's very clear that

15   there's a large degree of pro se lawyer bias in the New

16   Hampshire trial courts, but take that for what it's

17   worth.

18             I did a motion for reconsideration.  I even

19   pointed out to a lower trial court New Hampshire

20   judge --

21             THE COURT:  Slow down, please.  Go ahead.

22             MR. MARAVELIAS:  -- that, hey, even if this

23   restraining order petition was frivolous or patently

24   unreasonable, whatever, pick your word, bad faith, the

25   other party is seeking a cost that was incurred before I

1  ever filed said petition.  It was like these fees for

2  these transcripts or documents from a related case but

3  before.

4           So in order -- the only possible way for me to

5  not be wrongly deprived of that money, even assuming my

6  conduct was frivolous and bad faith from the get-go,

7  would be to file an appeal with our state's only

8  appellate court.  Even assuming that I engaged in

9  frivolous conduct, that finding itself, that legal fact

10  as a matter of law prevents the New Hampshire Supreme

11  Court from penalizing me for exercising my right, my

12  only right.  Again, where there is a wrong, there must

13  be a remedy.  That trial court wrongly ordered me to pay

14  costs that existed before I ever initiated that case,

15  even assuming I initiated that case in bad faith and

16  frivolous.  Thus, the New Hampshire Supreme Court has

17  waived its opportunity as a matter of law to pronounce

18  my entire appeal as frivolous.

19           And as a related matter, if the New Hampshire

20  Supreme Court by making passing reference to a rule it

21  never formally implemented nor even allowed the

22  opportunity to have an evidentiary hearing and a fair

23  dispute about, if it is allowed to arbitrarily command

24  away these large sums of money that litigants don't come

25  to supreme court anticipating that they could pay the

1   other side's fees, because I'm the first person in the

2   whole 143 year history, modern history, of the New

3   Hampshire Supreme Court as its presently organized, not

4   the supreme court adjudicators since 18 whatever, to be

5   ordered, who's pro se, to pay an opposing party's whole

6   fees, and I asked --

7          THE COURT:  How do you know that?

8          MR. MARAVELIAS:  Well, because I use Google.

9   They have very -- I can't say with certainty.

10         THE COURT:  No, you can't.  Look, I get it.

11         MR. MARAVELIAS:  They have catch phrases.  So

12  Rule 23 comes up rarely.  When it does come up, I put,

13  like, Rule 23 in quotes, New Hampshire Supreme Court in

14  quotes.  You're right.  I can't say for certain.

15         THE COURT:  You may very well be right.  You

16  may be the only one in history.

17         I'm just curious though.  I mean, I don't know

18  the facts of your case.  I know what you've told me.  I

19  read your complaint, and I'll admit I overlooked some

20  things because there are certain things about today's

21  presentation that surprised me but -- I don't know.  You

22  don't walk away from this entire experience thinking

23  that maybe you weren't really in the right place in this

24  litigation?

25         MR. MARAVELIAS:  Absolutely not, your Honor.

43

1   Are you referring to the original trial court matter?

2          THE COURT:  No.  I'm sort of referring to the

3   whole experience.  It didn't go well for you like at any

4   level.

5          MR. MARAVELIAS:  No, your Honor.  I have

6   complete 100 percent knowledge -- and there's actually a

7   separate lawsuit in this court's docket.

8          THE COURT:  I'm aware of it.  I'm aware of it.

9          MR. MARAVELIAS:  Yeah, same trial court judge.

10  I am completely, so far as you asked, a hundred percent

11  sure that --

12         THE COURT:  You feel that you're -- you feel

13  like you were within your rights to be making these

14  claims because you feel like you were in the right from

15  day one?

16         MR. MARAVELIAS:  Absolutely, your Honor.  I

17  feel like I've had stolen about $14,000, and only the

18  $4,700 I am claiming in this court.

19         I'm not asking this Court -- again, I'm not

20  asking this Court to overturn the $9,000 underlying, as

21  wrong as it was.

22         THE COURT:  I know.

23         MR. MARAVELIAS:  I recognize I can't do that.

24  I admit the Rooker-Feldman doctrine prevents me.  And

25  when the United States Supreme Court denied my petition

1    the other day, that's done.  That $9,000 is gone.  It's

2    a lot of money for a man who is very young.  And I

3    already paid that, by the way, but I refuse to pay the

4    $4,700 because the United States Supreme Court has

5    clarified that void judgments there's, unconstitutional

6    judgments, there's no obligation to pay them.

7            I'm hoping for an adjudication on the merits.

8    And I know that the New Hampshire Supreme Court has been

9    very -- they I think indirectly have admitted guilt by

10   doing nothing on the docket since May.  Their attorney

11   filed a motion for contempt against me since I only paid

12   him $700 so far.  It's all I could afford in the

13   meantime.  $600?

14           THE COURT:  Who represented the other side on

15   appeal?

16           MR. MARAVELIAS:  Simon R. Brown, Esquire,

17   Preti Flaherty.  And, you know, from my perspective

18   there was a request for relief, fees associated with the

19   motion to strike.  The prayer for relief in his motion

20   said the above requested relief.  There was a vague in

21   general question about all of it is frivolous, but there

22   was a specific prayer, "Insofar as Paul Maravelias's

23   motion to strike was frivolous, Mr. DePamphilis should

24   be awarded fees in connection with having to respond to

25   it."

1          And all the sudden surreptitiously, without

2    any knowledge or forewarning or notice to me, this thing

3    metastasized into $4,900 of appeals for a six-month

4    period.  The majority of which was incurred before I

5    even ever filed this allegedly frivolous motion.

6          So the motion for -- the attorney's fees

7    request in that state court appellate case came in when

8    I filed a motion to strike the appellate brief because

9    if you look at the appendix, they've blurred out certain

10   text messages.  So it was completely not -- they even

11   admitted, oh, yeah, sorry.

12         So it was nonfrivolous, but the request came

13   in at a certain time when I filed the motion to strike,

14   and now I'm being told that I have to pay fees that the

15   other party incurred weeks and months before I even

16   filed my allegedly frivolous motion.

17         So going back to your original question, your

18   Honor, I have no doubt in my mind that I'm in the right

19   place.  I have no doubt in my mind that I have a right

20   to a remedy.

21         THE COURT:  But they waived that claim on

22   appeal.

23         MR. MARAVELIAS:  I'm sorry, your Honor?

24         THE COURT:  Didn't they waive the claim on

25   appeal to the fees incurred before --

1          MR. MARAVELIAS:  Sorry for being ambiguous.

2          They waived -- so that was different.

3          THE COURT:  All right.

4          MR. MARAVELIAS:  So in the appellate fees, the

5    4,900, this thing, the 4,900, over half of that is like

6    the fees for them to write their appellate brief which

7    predated my allegedly frivolous appellate case act of

8    filing a motion to strike in the New Hampshire Supreme

9    Court.

10          THE COURT:  Oh, okay.

11          MR. MARAVELIAS:  So the original 9,000 was --

12          THE COURT:  We're just going to have to agree

13   to disagree on that.  I don't view their motion for fees

14   as being restricted to your motion to strike.  I

15   understand your argument.  I just don't accept it.

16          MR. MARAVELIAS:  Okay.

17          THE COURT:  All right.  Well, okay.  So you've

18   told me about judicial immunity.  You've told me a lot

19   about Rooker-Feldman.

20          Is there anything else you want me to know?  I

21   have a couple more questions for Attorney Smith, but is

22   there anything else you want me to know?

23          MR. MARAVELIAS:  Yes, your Honor.  Just very

24   briefly on the Eleventh Amendment issue.

25          THE COURT:  Yeah.

1          MR. MARAVELIAS:  My position is the _Ex Parte_

2   _Young_ allows me to sue --

3          THE COURT:  You've got to slow down, man.

4          MR. MARAVELIAS:  Sorry, your Honor.

5          THE COURT:  It's okay.

6          MR. MARAVELIAS:  My position is that the

7   _Ex Parte Young_ doctrine does permit suit against state

8   judicial actors for declaratory and injunctive relief to

9   bring them into compliance with federal law.

10          However, the Court doesn't even need to

11   consider that because, as I briefed in my objection to

12   the defendants' motion to dismiss, which I don't think

13   that they replied to in their reply, in this particular

14   case, when the state exercises a monetary assessment,

15   which is the argument, assuming the defendant is the

16   state of New Hampshire, which I dispute that, assuming

17   that there is a legal equivalence, well, the state of

18   New Hampshire consents to being sued in that case.  And

19   I cited the case law.

20          And there's also case law that basically

21   waives the Eleventh Amendment claim if there's an

22   allegation that there was a determination that violated

23   the federal due process.  So I think that the Eleventh

24   Amendment can be -- I think that this comes to the

25   Rooker-Feldman and to the judicial immunity.

48

1          THE COURT:  All right.

2          Attorney Smith, let me ask you a question.  If

3  someone has a claim against the New Hampshire Supreme

4  Court, who do they sue and who do they serve?  In other

5  words, do you sue -- I know you can sue justices in

6  their official capacity, you can do that.  But when

7  you're suing the court, is it just you're suing the

8  state, or are you suing the court as a governmental unit

9  of the state, and who do you serve?

10          I thought the secretary of state, but I don't

11  know.  Do you know?

12          MS. SMITH:  Because of the separation of

13  powers, it's a separate branch of government, it would

14  have to be served on presumably the Administrative

15  Office of the Court, and the court -- I don't think the

16  secretary of state who is part of the -- although the

17  secretary of state is a unique --

18          THE COURT:  I just mean for the purposes of

19  accepting service, not as a litigant or a party.  I

20  mean, exactly.  I guess you're trying to tell me you

21  think the entity to serve would be the AOC.  I'm not

22  sure what the authority is for that, but I don't know

23  the answer to it either.  That's why I'm asking.

24          MS. SMITH:  Right.  I can tell you that is the

25  practice --

1           THE COURT:  It is?

2           MS. SMITH:  -- that claims to the court get

3    served on the Administrative Office of the Court.

4           THE COURT:  That's a good answer.  All right.

5           Is there anything else you wanted to say to

6    me?

7           MS. SMITH:  I had two small other points in

8    listening to -- I'm sorry, but I can't pronounce your

9    last name correctly, and I apologize for that.

10          One is that, regarding his claim, he was not

11   allowed to present evidence regarding the itemization

12   because he had previously filed a motion for

13   reconsideration regarding the request for attorney's

14   fees, et al.

15          THE COURT:  Yeah.

16          MS. SMITH:  To the extent there's a rule

17   discouraging repeat motions for reconsideration, that

18   wouldn't have barred a motion or an objection to the

19   itemization.

20          THE COURT:  Yeah.

21          MS. SMITH:  So that was the only thing there.

22          To the extent that he had some -- he had

23   talked quite a bit about objecting to the distinction

24   between original jurisdiction and appellate

25   jurisdiction.

1              THE COURT:  Yes.

2              MS. SMITH:  And that somehow the order of

3    attorney's fees is invalid because it's original

4    jurisdiction and there's no appeal from it in the state

5    court system.  You're probably very familiar with the

6    history of state court.  There has not always been --

7    there is not an appeal of right regarding everything in

8    the state court system.

9              THE COURT:  No, no.

10             MS. SMITH:  And there's actually a First

11   Circuit case where an attorney argued that the

12   challenge, it was a divorce order, that there was not an

13   appeal of right to, that that was a denial of

14   constitutional rights because there wasn't an appeal as

15   a right to every state court order, and that was

16   rejected by the First Circuit.  I don't have the cite

17   here, but I was involved in that case.  So the case name

18   involved was Mr. D'Angelo versus the court system.

19             THE COURT:  I'm familiar with the case.  I am.

20             All right.

21             MR. MARAVELIAS:  Your Honor, may I briefly

22   respond?

23             THE COURT:  I'll give you the last word for

24   now, Mr. Maravelias.

25             MR. MARAVELIAS:  Just briefly on two points.

1          First of all, I did read that case, the Mr.

2     D'Angelo case.  That's distinguishable because it's been

3     held there's no mandatory right of appeal where there's

4     no federal constitutional right.

5          Here there is.  There's the due process.

6     There's also the equal protection.  So I can talk about

7     that later today, but in order to sustain --

8          THE COURT:  I'm just curious.  What's your

9     equal protection?  Due process is one of those fairly

10    amorphous claims that lots of things can fit into.  What

11    would be equal protection?  What's your protected

12    status?

13         MR. MARAVELIAS:  Similarly situated to pro se

14    litigants who have faced similar circumstances where the

15    opposing party filed a motion for attorney's fees.

16         THE COURT:  So it's pro se litigant?

17         MR. MARAVELIAS:  Pro se litigant and also me

18    individually.  So the United States Supreme Court in

19    Village of Willowbrook versus --

20         THE COURT:  So you're a class-of-one?

21         MR. MARAVELIAS:  Class-of-one.  But I don't

22    even need to rely on the class-of-one doctrine.

23         THE COURT:  Well, you said you individually.

24         I'm just trying to understand.  As an equal

25    protection violation, what is your category?

1          MR. MARAVELIAS:  An individual litigant pro se

2     in the New Hampshire Supreme Court, and as Paul

3     Maravelias, someone who has spoken publicly against the

4     people over there and they do not like as an individual.

5          And to sort of buttress that claim, I went

6     through the Rule 23 case law, sparse as it is, and saw

7     some very, very illuminating circumstances where there

8     were way more frivolous circumstances trying to obtain

9     an adjudication of the same rejected legal argument for

10    the fourth time, and they still denied the Rule 23, and

11    I have others.  That clearly shows, along with the

12    timing of those two orders, that goes back to the first

13    retaliation claim, they're acting in bad faith, it's

14    retaliatory, putting me into a class-of-one.

15          Secondarily, the matter about the Rule 22

16    motion for reconsideration.  Could I have filed another

17    motion for reconsideration about, like, separating the

18    merits of the judgment itself to the itemization of the

19    fees?  I disagree with that, but my point to the Court

20    at this stage is that that's a factual matter and

21    dismissal at this stage would not be appropriate since

22    we have to assume that all of the facts are of course

23    not conclusions of law, but that's a factual dispute

24    that I could have a right to use discovery to prove

25    that, no, in fact I did not have meaningful recourse

1   under the appellate rules of the state of New Hampshire

2   Supreme Court to file another motion for

3   reconsideration.  So that's a factual, not a legal

4   question.

5           THE COURT:  All right.  I'm going to have one

6   more question for you, Mr. Maravelias, and then I want

7   to take a short break to give the reporter a break, and

8   I'm going to confer with my law clerks a little bit and

9   see what they think about a couple of things, and then

10  I'm going to come back out.

11          If I told you hypothetically that I actually

12  think you have a valid, not a valid, but you have a

13  colorable claim here that should not be dismissed of a

14  facial challenge to Rule 23, would you want to leave it

15  as is, or would you want to amend it and replead it?

16          MR. MARAVELIAS:  If I were a hundred percent

17  sure that the only remedy that I would be -- that the

18  only claim I could pursue in this court would be the

19  facial challenge, which I do not assent to that.

20          THE COURT:  You don't assent to it.  I know.

21  I'm not trying to talk you into it.  I'm just asking a

22  question.

23          MR. MARAVELIAS:  Right.  In that case I would

24  appreciate a second amended complaint to buttress that.

25  I think the Court would benefit from more comparative

1    research to the other comparative statutes.

2            That part of my amended complaint was probably

3    the most cursorily done.

4            THE COURT:  Yeah, it's -- thinking about that,

5    to be honest -- let me talk to you about it though,

6    because to me -- I mean, I actually think Rooker-Feldman

7    bars much of this.  I do.

8            So if I allowed you to amend on your facial

9    challenge to that rule, which would not be an attempt to

10   undue the order to pay attorney's fees.  It would be a

11   challenge to that statute as you describe as violative

12   of the United States Constitution.  That wouldn't be

13   asking for you to, like, replead all your other claims

14   trying to re-litigate this motion.  I'm not looking for

15   that.  Do you understand that?

16           MR. MARAVELIAS:  I understand currently, sir,

17   that if this Court were to dismiss my claims which are

18   outside the scope of the facial challenge, and, you

19   know, I could take an appeal of that.

20           THE COURT:  Yes.

21           MR. MARAVELIAS:  But then if I were to file a

22   second amended complaint that my argumentation would be

23   fully divorced from these specific acts and would focus

24   on the language and the overbreadth doctrine and what

25   level of due process protections and the comparison to

1  the federal rules of procedure, appellate Rule 38, which

2  has something similar but way better and it's not

3  facially invalid, and I would be very disciplined and

4  respectful not to disobey the intention.

5          THE COURT:  Let me ask you just one more

6  factual question.

7          So Attorney Brown and the family that you're

8  involved in this litigation with, or were, where does.

9          +that stand?  Is he still trying to collect

10  every penny?  Has he offered a way out of all this?

11          MR. MARAVELIAS:  I think he is very scared

12  because he understands that his conduct in relation to

13  this was criminal, and in the motion for contempt that I

14  filed with --

15          THE COURT:  You think Simon Brown is fearful

16  that his conduct was criminal in some way you've

17  exposed?

18          MR. MARAVELIAS:  Yes, your Honor.  I

19  enumerated 23 counts of criminal misconduct.  I did not

20  submit that motion for contempt in this court because

21  this lawsuit is not against Simon Brown.  This lawsuit

22  is against the governmental entity insofar as it had a

23  duty --

24          THE COURT:  Let me ask you this question.  Did

25  you ever consider hiring a lawyer?

1          MR. MARAVELIAS:  Your Honor, I did the first

2    time around when they first put the stalking -- this

3    restraining order against me in 2017, and I didn't at

4    the original stalking hearing for this restraining

5    order.

6          I didn't stalk this girl.  I know I'm right.

7    They're lying.  So I didn't think I needed an attorney.

8    That turned out to be a fatal error.

9          And when I did hire an attorney and spent all

10   the money I had pretty much to make that first appeal of

11   the restraining order back in 2017 --

12          THE COURT:  Slow down.

13          MR. MARAVELIAS:  -- the New Hampshire Supreme

14   Court completely denied -- they didn't deny it, but they

15   affirmed.

16          THE COURT:  Affirmed.

17          MR. MARAVELIAS:  They affirmed not

18   adjudicating the merits of my claim but saying, oh, you

19   didn't preserve this.

20          And to be honest, I'm thinking of bringing

21   another federal suit because I've seen other restraining

22   order appeals where it's an attorney that they like, or

23   if it's not me, and they argue plain error, hey, my

24   client was pro se in the restraining order hearing but

25   you should hear these arguments under plain error

1   because of substantial fairness, and they reverse.

2           THE COURT:  You're not alone in this approach,

3   but you definitely seem to think that, you know, the

4   solution to all your litigation problems is more

5   litigation.  I'm just wondering how you came to that

6   conclusion.  You're obviously such an articulate, bright

7   person, but this stuff has to be taking up a lot of your

8   time and energy.

9           MR. MARAVELIAS:  Yes, sir.

10          THE COURT:  By the way, I'm not suggesting

11  that you don't sincerely believe you need to be

12  vindicated.  I get it.  I take your word for it.  I just

13  wonder about the use of your time and resources when --

14  I don't know -- or just the idea of maybe just getting

15  some legal advice, because some of your arguments make a

16  lot of sense.  They really do.  A lot of them don't, and

17  there's no way for you to know that because you're doing

18  the best you can with a great mind but not a lot of

19  training, and I just wonder if just a little bit of

20  expertise -- you have a right to be pro se, but I wonder

21  if you might just be better positioned with some advice.

22  I mean, are you in a position -- do you have the means

23  to hire counsel, or is it just a situation where you're

24  kind of stuck with litigating on your own because you

25  don't have the resources?

1          MR. MARAVELIAS:  I think it's a combination of

2  both.  I think I enjoy the learning experience, but of

3  course I am not an attorney.  I also really don't have a

4  lot of disposable income.

5          It's also -- your Honor, frankly it's very

6  emotional, and especially in the other case that's

7  pending before Judge McAuliffe.  That is such a black

8  and white case that's even further beyond this in terms

9  of illegality.  I'm very motivated about that, and I

10  know --

11          THE COURT:  You've got a lot invested in it.

12          MR. MARAVELIAS:  I have a whole lot invested

13  in it, yes.

14          THE COURT:  All right.  We're going to take a

15  little recess.  I'll be right back.  I just want to give

16  the reporter a break.

17          (RECESS)

18          THE COURT:  All right.  I want to thank

19  plaintiff and defendants' counsel for their arguments

20  and their presentations.  They were both helpful to the

21  Court, both the written and oral.

22          Here's where I come out.  Yeah, one thing I

23  just want to make sure is a factual point.  One thing

24  that we've disagreed on, Mr. Maravelias, is just the

25  idea that the attorney fee motion in the supreme court,

1   your view is that it was limited to fees incurred and

2   costs incurred with respect to your motion to strike?

3           MR. MARAVELIAS:  That's correct, your Honor.

4           THE COURT:  And I think it was -- it's Exhibit

5   D here on the amended complaint, but the motion argues

6   that the appeal was "in whole frivolous and in bad

7   faith," and it makes a request in the request for relief

8   that, "The award of DePamphilis's attorney's fees in

9   connection with defending this appeal."

10          I just think that read properly, and the way

11  the Court fairly read it, it was for costs and fees

12  incurred with respect to the appeal as a whole.

13          But look, if I'm wrong about that, you know,

14  I'm sure you're going to appeal it.  The Court of

15  Appeals can tell me I was wrong, but that's how I read

16  it.  That's just a factual issue.

17          The bottom line is this.  I'm going to grant

18  this motion in part probably in the majority, but I

19  think Mr. Maravelias at least arguably here has pleaded

20  a colorable facial challenge to Rule 23.  We'll talk

21  about in a minute whether you want to go with the way

22  you've pleaded it here or whether you want to amend, I'm

23  going give you the choice, but for now I think I'm not

24  going to dismiss that part of the claim.

25          I am going to dismiss most of the claim though

1    under the Rooker-Feldman doctrine and under judicial

2    immunity.  I'm not going to reach the Eleventh Amendment

3    argument because I don't think it's necessary in this

4    case.

5           But look, the defendant has argued that the

6    Rooker-Feldman doctrine bars everything, and the

7    plaintiff has said not so, it doesn't bar everything

8    here, and he cites five reasons.  One, that the fee

9    award is not final; one that the fee award is not

10   judicial or a judgment; one is that it's void; and one

11   is that the doctrine will leave him without a remedy and

12   there's a remedy for every injury.

13          I don't think those arguments prevail for the

14   plaintiff in this case.  I think Rooker-Feldman

15   nonetheless defeats the claims.

16          However, I don't think Rooker-Feldman prevents

17   his facial challenge to Rule 23, which is separate.

18          I'm going to address these issues one at a

19   time here, and this order -- and the transcript is going

20   to be your order, just so you understand that, because

21   the case isn't over.  We're going to continue.

22          With respect to the finality argument, the

23   argument as I understand it from the plaintiff is that

24   the state proceedings regarding the appellate fee award

25   aren't over so Rooker-Feldman doesn't apply.

1          Now, the test is state proceedings are ended

2     for the purposes of Rooker-Feldman if, one, the highest

3     state court in which review is available has affirmed

4     the judgment below and nothing is left to be unresolved;

5     second, the state action has reached a point where

6     neither party seeks further action; and third -- or

7     third, the state court proceedings have finally resolved

8     all federal questions in the litigation leaving only

9     state law or purely factual issues.  That's the

10    Federación case, it's a 2005 First Circuit case, 410

11    F.3d 17.

12          Now, the highest court in New Hampshire did

13    issue judgment in this case, and that Court's procedures

14    provides for no further consideration of this judgment.

15    That's Rule 22.

16          Now, the plaintiff's motions don't disturb the

17    finality of the supreme court's judgment.  A party can't

18    bypass Rooker-Feldman by simultaneously filing a federal

19    lawsuit attempting to reopen a state court case with

20    some kind of motion or unrecognized procedural

21    undertaking.

22          So the cross-motions for contempt also do not

23    affect the finality of the Rule 23 award because they

24    concern enforcement of the award or a request for other

25    sanctions.

1          This award is a "final judgment or decree

2    rendered by the highest court of the state in which the

3    decision could be had," and therefore the proceeding are

4    over for the purposes of Rooker-Feldman."  Again, that's

5    the Federación case.

6          Now whether the act was a judgment, that's the

7    second argument.  The second argument the plaintiff

8    makes is that the Rooker-Feldman doctrine bars only

9    review of judicial orders.  The plaintiff says this

10   isn't judicial, it's not a judgment.  He quotes Blacks

11   Law Dictionary.  He did today in court.  My view is

12   different though.  I don't think the Blacks Law

13   Dictionary definition cited by the plaintiff here

14   suggests that a judgment can only exist if a party has a

15   preexisting right.  I just don't understand that to be a

16   component or a prerequisite for a judgment.  A fee

17   award, even if it's not as a matter of right, resolves

18   directed claims of the party in the judicial matter.

19          The Edlund versus Montgomery case, a District

20   of Minnesota case, 2005, put it as follows:

21          "The award of attorney's fees and costs, or

22   the decision to deny such an award as a sanction for

23   attorney misconduct in the case, is a quintessential

24   judicial act, part of resolving the dispute between the

25   parties before the court."  Again, Edlund v. Montgomery,

1    355 F.Supp.2d 987.

2              Now, Mr. Maravelias also argued that the fee

3    award was legislative, not judicial, because the supreme

4    court is sort of like, how do I put it, is the

5    legislator.  It promulgated Rule 23.  I see what you're

6    saying, all right?

7              Now, while the supreme court might act in a

8    legislative fashion promulgating a rule, the application

9    of that rule and the dispute in question between Mr.

10   Maravelias and the DePamphilis family was judicial.  It

11   applied a preexisting rule.  Although it was a rule that

12   it had created, as the plaintiff points out.

13             I refer the parties to a 1983 U.S. Supreme

14   Court case, the D.C. Court of Appeals versus Feldman,

15   460 U.S. 462, where the court found that the court's

16   application of a court-made rule in specific cases was

17   in fact judicial.

18             On this judicial action argument Mr.

19   Maravelias also argues that the award can't be judicial

20   because the supreme court did not make specific findings

21   of fact or cite any law, except Rule 23, or give him a

22   hearing.

23             The supreme court fee award, though, accepted

24   DePamphilis's argument, rejected Maravelias's argument,

25   and specifically cited Rule 23 which allows -- which

1    only allows for the award of appellate attorney's fees

2    "to a prevailing party if the appeal is deemed by the

3    court to have been frivolous or in bad faith."

4            So, therefore, this Court's view is that the

5    supreme court found the plaintiff's appeal was frivolous

6    or in bad faith.

7            Now, I understand plaintiff may wish for more

8    detail or wanted more findings, but I don't know of any

9    threshold level of detail necessary to render a judicial

10   ruling, a judgment or truly judicial -- a civil jury

11   verdict is a great example of that, right?  A civil jury

12   verdict -- there might be one line on the verdict form:

13   For which party do you find?  Juries don't make

14   findings.  It's implicit that they made the finding that

15   the elements of proof had been satisfied.  It's just as

16   implicit here that the New Hampshire Supreme Court made

17   the findings that are required for the satisfaction of

18   the Rule 23 burden.

19           The supreme court considered and rejected his

20   motion to reconsider.  That ruling is a judgment on the

21   issues raised in that motion even after a detailed

22   analysis, and a declaratory judgment finding that the

23   Rule 23 award violated the Constitution would

24   effectively have reversed that award.  So to that extent

25   the Rule 23 is barred to the extent it seeks to undo a

1     monetary award.

2          Now, Mr. Maravelias cites a couple of cases

3     for the proposition that the supreme court's order here

4     was not judicial, the Kiowa Indian Tribe case and the

5     Fontana Empire Center, LLC case.

6          The Kiowa case is 150 F.3d 1163, and the

7     Fontana Empire Center case is 307 F.3d 987, but those

8     cases discuss challenges to the particular means used in

9     those cases to enforce judgments, not to the legality of

10    the underlying judgment.  It was the means and

11    enforcement.

12         And what Mr. Maravelias is seeking here is a

13    declaratory judgment that would bar any enforcement of

14    the judgment because the judgment itself was unlawful.

15    He's not just seeking to bar enforcement by a particular

16    means but any enforcement at all.

17         Those cases don't I think help his position.

18         Now validity.  Mr. Maravelias also argues that

19    the supreme court's fee award is void, just void,

20    nonexistent, because it was made in a complete absence

21    of jurisdiction and inconsistent with due process.

22         Defendants here point out, though, that Part

23    II, Article 73-a, of the state constitution gives the

24    New Hampshire Supreme Court the power to make rules with

25    the force and effect of law that govern "the

1    administration of all courts in the state in the

2    practice and procedure to be followed in such courts."

3           There's also a statute for that proposition.

4    Section 490:4.  RSA 490:4.  Rule 23 is thus promulgated

5    pursuant to lawful authority in this Court's view, and

6    the supreme court does not act outside of its

7    jurisdiction in awarding fees based on it.

8           Now, you know, in the United States of America

9    many appellate courts have the authority to award

10   attorney's fees.  Federal courts do in -- Federal Rule

11   of Appellate Procedure 38 permits a federal court of

12   appeals to award damages and costs if it determines the

13   appeal is frivolous.  Courts of judgment have certain

14   inherent powers "governed not by rule or statute but by

15   the control necessarily invested in courts to manage

16   their own affairs so as to achieve the orderly and

17   expeditious disposition of cases."  That's a U.S.

18   Supreme Court case, Chambers versus Nasco, 501 U.S. 32,

19   a 1991 case.

20          That's what I really meant, Mr. Maravelias,

21   when I was telling you that I just can't imagine the

22   U.S. Supreme Court telling the highest courts in the

23   states that it can't administer its docket this way.  I

24   think that's just a matter of federalism and judicial

25   comity.  I don't -- I just don't foresee that kind of

1   finding.

2           Now, the New Hampshire Supreme Court has

3   "recognized a constitutionally created court's power to

4   award counsel fees in any action commenced, prolonged,

5   required, or defended without any reasonable basis in

6   the facts provable by evidence, or any reasonable claim

7   in the law as it is, or as it might arguably be held to

8   be."  That's the <u>Keenan</u> case, 130 New Hampshire 494,

9   1988.

10          Let me acknowledge, Mr. Maravelias, I know you

11  don't consider your case to be that type of case.  I do.

12  Perhaps reasonable minds can differ about that.  It's

13  just that the supreme court does -- the New Hampshire

14  Supreme Court does, and it's the highest court in this

15  state.  And Rooker-Feldman, by my view, doesn't permit

16  me to express my disagreement with that conclusion.

17          This authority of the New Hampshire Supreme

18  Court "rests not only on the essential judicial power to

19  get the judicial job down once and for all but also on

20  the power subsumed under equity jurisdiction to

21  compensate a party for his opponent's unreasonableness

22  in prolonging unnecessary litigation."  Same case,

23  <u>Keenan</u> case.

24          Now, Mr. Maravelias makes an interesting point

25  that even if Rule 23 is valid, the supreme court here

1   didn't comply with it, didn't follow the rule, because

2   it didn't make a specific finding that the appeal was

3   frivolous or in bad faith.  But as I've already

4   discussed, I think it's implicit in the Court's ruling

5   that it accepted DePamphilis's arguments that the appeal

6   was frivolous and in bad faith.  Mr. Maravelias did have

7   notice of those arguments.  He had an opportunity to

8   respond and an opportunity to move for reconsideration.

9           He has pointed out some applicable authority

10  requiring the supreme court to hold a hearing or make

11  detailed findings before awarding attorney's fees.

12          The U.S. Supreme Court's statement in Roadway

13  Express v. Piper that "a specific finding as to whether

14  counsel's conduct constituted or was tantamount to bad

15  faith should precede any sanction under the court's

16  inherent powers."

17          But I think that holding by the supreme court

18  is distinguishable.  The supreme court there in the

19  Roadway case awarded fees based on a statute allowing

20  costs to be awarded against parties who unreasonably and

21  vexatiously multiplied the proceedings.  It's a very

22  specific undertaking.  Now, that's a standard for which

23  -- did not involve bad faith.  This involves bad faith.

24  The New Hampshire court's ruling involved bad faith.

25  The U.S. Supreme Court held that attorney's fees could

1　not be awarded as costs under that statute, but it did

2　remand the case to the district court to consider

3　whether fees might be available based on bad faith.

4　　　　　Here the New Hampshire Supreme Court awarded

5　fees based on Rule 23, and therefore implicitly,

6　necessarily, and specifically found that Maravelias's

7　appeal was frivolous or in bad faith.

8　　　　　Again, I know Mr. Maravelias disagrees, but

9　the final arbiter of that question is the New Hampshire

10　Supreme Court.

11　　　　　The second to last argument that Mr.

12　Maravelias advances against the Rooker-Feldman

13　application in this case is the idea that it leaves him

14　without a remedy.  He says applying Rooker-Feldman to

15　him and his case would leave him without an effective

16　remedy and violates this doctrine *ubi jus ibi remedium*,

17　for every wrong there must be a remedy, and his point is

18　that the discretionary appeal to the U.S. Supreme Court

19　cert. is not adequate in part because the process

20　generally assumes at least one level of state appellate

21　review, but he doesn't point to any authority suggesting

22　that this maxim, this doctrine of remedy overrides

23　Rooker-Feldman.  I don't have any -- I couldn't find any

24　authority either, looked for it, whether this idea of

25　this remedy -- or this doctrine, the denial of a remedy

1    somehow undermines the application of Rooker-Feldman.  I

2    can't find authority for that.

3            He cites Helminski, which is a District of

4    Colorado case, 603 F.Supp. 401, Mr. Maravelias cites it,

5    and it involved a challenge to a federal court rule

6    though, not a specific judgment.  And that may be the

7    key to this lawsuit here, a challenge to a rule as

8    opposed to the judgment.

9            Now, these are facial challenges in some

10   respect.  At least claims 11 and 12 are facial

11   challenges to Rule 23, according to Mr. Maravelias, and

12   therefore not covered by Rooker-Feldman.

13           Defendants in this case have conceded that the

14   Rooker-Feldman doctrine does not bar a general attack on

15   the constitutionality of state law that does not require

16   review of a judicial decision of a case, but this

17   exception does not apply if the relief sought in federal

18   court is directed towards undoing a prior state

19   judgment.  That's the argument Ms. Smith was making, the

20   first thing she said today.

21           Now, while much of Mr. Maravelias's requested

22   relief is directed toward undoing the fee award in this

23   case, his complaint can be read as requesting a

24   declaratory judgment that Rule 23 is unconstitutional

25   separate and apart from any reference to the award.  And

1    the D'Angelo case is the case I think that creates this

2    opportunity.  212 District of New Hampshire 204.  Judge

3    DiClerico's case from 2012.  The Westlaw cite is 2012

4    Westlaw 6647807.

5         So I think while all of Mr. Maravelias's other

6    claims and requested relief do run afoul of

7    Rooker-Feldman and are thus barred by Rooker-Feldman, I

8    think his facial challenge to Rule 23 requesting only

9    declaratory relief is separable and colorable and should

10   be allowed to proceed.

11        As far as the judicial immunities go, those

12   doctrines buttress Rooker-Feldman in this case.  The fee

13   award was a judicial action in this Court's view.  It

14   was within the New Hampshire Supreme Court's

15   jurisdiction based on this Court's view, so I think

16   Chief Justice Lynn is entitled to judicial immunity on

17   that point.

18        The Mann v. Conlin case, 22 F.3d 100, stands

19   for the proposition that the award and collection of

20   attorney's fees are paradigmatic judicial acts even if

21   they're erroneous or unduly harsh.

22        Now, since the Rooker-Feldman doctrine bars

23   all of these claims other than the facial challenges,

24   I'm not going to reach the Eleventh Amendment, but the

25   plaintiff's facial challenges to Supreme Court Rule 23

1  are thus not barred by the Rooker-Feldman doctrine or

2  defendants' asserted immunities.

3          Now, they may be vulnerable to another motion

4  to dismiss, that's certainly in play, but for today the

5  motion is denied as to that.

6          I'm going to ask you then -- I think you know

7  where I'm coming from here.  I think your facial

8  challenges are separable from your request to undo the

9  order, and that's not barred by Rooker-Feldman.

10          So the question is -- likely I would

11  anticipate the defendant -- you're going to move to

12  dismiss that as well as a facial challenge, qua facial

13  challenge, right?  Do you understand me?  Should I

14  correctly assume that you're going to move to dismiss

15  the facial challenge as a facial challenge?

16          MS. SMITH:  Yes.

17          THE COURT:  Okay.  That said though, you

18  didn't -- you know, you've been dealing with it as a

19  Rooker-Feldman challenge, and I do want to give you the

20  opportunity to reframe your challenge.  I mean, I could

21  dismiss the whole complaint without prejudice to that,

22  but I don't want to make you start your lawsuit all

23  over.  I don't think it makes sense -- or I don't think

24  it's a good use of resources.  It might end up with

25  another judge, and honestly I think I ought to handle

1    this because I know about the case now.  I understand

2    where you're coming from.

3            So do you want to amend your complaint?  You

4    can amend it to state only a facial challenge to Rule 23

5    without, you know, an effort to undo the ruling, just a

6    facial challenge with respect to which you have

7    standing.  Is that something you would like to do?

8            MR. MARAVELIAS:  Yes, your Honor, and thank

9    you for your thoroughness.

10           THE COURT:  How much time would you like to do

11   that?

12           MR. MARAVELIAS:  I would like 60 days, your

13   Honor.  I would also ask for a bench ruling, either on

14   fact or on law, I'm not sure, but on whether the named

15   defendants would be acting in an enforcement capacity.

16           So assuming the Court is correct that the

17   declaratory relief I have requested is afoul of the

18   Rooker-Feldman doctrine because it requires review and

19   rejection of a judicial act, are the defendants acting

20   in their enforcement capacity?  Because if they are, a

21   federal statute, 42 U.S.C. 1983, puts me in quite a

22   quandary.  It says, "Injunctive relief shall not be

23   available unless a declaratory decree was violated or

24   was not available."  So this is a catch-22 situation.

25           I can't ask for declaratory relief because

1    that runs afoul of the Rooker-Feldman doctrine.

2    However, in theory, as the distinction you made, if

3    we're just going after the enforcement of an order,

4    which would be repugnant to my federal constitutional

5    rights, that would not frustrate -- those Kiowa Tribe

6    case and the other one.  However, I can't come for just

7    the injunctive relief, prospective injunctive relief if

8    I can't get the declaratory.

9           So I just want to preserve that argument for

10   the First Circuit.  I understand it's an interesting

11   area of law.  I didn't look too much into that, but I

12   think that if this Court issuing a bench ruling on

13   whether or not the defendants would have an enforcement

14   capacity in that attorney's fees order, whereas it might

15   be different if it's a regular attorney's fees order in

16   a lower court as usually happens, I think that that

17   bench ruling might confine if I decide to appeal that

18   aspect, so I would ask for that.

19          But on the idea of the amended complaint and

20   just the facial challenge, I appreciate that, I thank

21   you for that, and, yes, I would like to do that.

22          THE COURT:  I'll give you the 60 days.

23          MR. MARAVELIAS:  Thank you, your Honor.

24          THE COURT:  I'm trying to wrap my mind around

25   the request you're making though here because I don't

1   think you have to sue anybody -- I don't think you have

2   to sue any individual judge, individually or in an

3   official capacity, to mount this challenge to Rule 23.

4   I don't think you need to do that.

5          Why do you want to do that?

6          MR. MARAVELIAS:  Well, in order to --

7          THE COURT:  That's what you want, right?

8          MR. MARAVELIAS:  Well, I just want an

9   adjudication on two things.  The facial

10  unconstitutionality.  I have an altruistic purpose in

11  that, to make sure other litigants aren't put in this

12  position that I am.  And the first thing is what you're

13  denying right now, you know, to preclude the enforcement

14  of that.

15         The federal legislature has required me to

16  obtain declaratory relief that this particular order is

17  unconstitutional federally before I could obtain the

18  okay, non-Rooker-Feldman violative relief

19  that's perspective injunctive --

20         THE COURT:  Of an enforcement capacity?

21         MR. MARAVELIAS:  Towards the enforcement

22  capacity.

23         So to make a very brief reference to my other

24  federal lawsuit in this court, that problem doesn't

25  exist because the relief I'm requesting there, the state

1    of New Hampshire criminal enforcement, the attorney

2    general, the county attorney, my local police

3    department, I sued them for their enforcement capacity.

4    I threw in the judge, too, but that's a different reason

5    there.

6              This is different because who's going to

7    enforce -- it's not a criminal charge if an enforcement

8    proceeding were to be brought against me.

9              THE COURT:  Yeah, I don't think the judges

10   would need enforcement though.  I think it would be, you

11   know, the sheriff, however you seek to enforce a civil

12   remedy.  I don't view the judges -- the judges are

13   acting judicially.  And if that's what you're asking in

14   ordering attorney's fees, I think that's a judicial

15   decision entered in a judicial capacity and thus barred

16   by Rooker-Feldman and immunity.

17             So I'm not going to tell you how to bring your

18   lawsuit, to be honest.  I asked a few questions to

19   Attorney Smith about who's the proper party and who do

20   you serve.  Frankly, you know, I don't know what

21   position she'll be in, but you don't have to do any of

22   that.  You just amend.

23             I don't view this as a situation where you

24   need to include justices to seek this relief.

25             Your point is, then what do I do for the next

1    step because I need this declaratory judgment first.  I

2    think you cross that bridge when you come to it, but I

3    can't give you advice about how to proceed.

4         I'm not sure what judicial ruling you're

5    asking me for.  You've asked me a couple times, and I

6    know you're doing your best, but I'm not following you.

7         MR. MARAVELIAS:  Whether or not the defendants

8    acted in an enforcement capacity with respect to the

9    order awarding $4,900 allegedly under Rule 23, assuming

10   it's a valid judicial act, because there's case law in

11   Consumers Union versus the Supreme Court of Virginia

12   that says, well, the supreme court -- the state supreme

13   court justices were validly held in their enforcement

14   capacity.  It only happens -- typically the only time

15   that that happens is in a bar -- well, for instance,

16   Piper versus New Hampshire Supreme Court, it was a

17   United States Supreme Court appeal, and the New

18   Hampshire Supreme Court justices back in the '80s where

19   it lively held from an enforcement capacity, and the

20   attorney from Vermont was denied because there was a

21   practice under the color of state law, and the New

22   Hampshire legislative promulgators thereof also enforced

23   it.

24        I think that's an additional aspect.  I'm not

25   asking you to reconsider.  I mean, I want to research it

1   more and see if it's worth an appeal, but it might save

2   us all some time if the Court were to make a bench

3   ruling on whether or not the defendants have an

4   enforcement capacity because --

5           THE COURT:  Have an enforcement -- I don't

6   know.  I know in this case they were acting in a

7   judicial capacity, not an enforcement capacity.  That's

8   the ruling.

9           MR. MARAVELIAS:  So the Court's position is

10  that they're mutually exclusive, they cannot have both a

11  judicial and an enforcement capacity?

12          THE COURT:  I didn't say that.  Look, if you

13  want to amend your suit in a way that you think captures

14  your conduct in a permissible way as part of a facial

15  challenge, have at it.  I can't micromanage your lawsuit

16  from here.

17          MR. MARAVELIAS:  Yes, your Honor.

18          THE COURT:  I'm only making a ruling on the

19  filings you've made, your complaint, and the filings

20  that were made against it.  I've granted the majority of

21  it, but I have not dismissed the case as a facial

22  challenge, and you have 60 days, which is -- we're going

23  to call it --

24          THE CLERK:  December 16th, your Honor.

25          THE COURT:  December 16th as a deadline to

1    file your amended complaint alleging a facial challenge

2    to Rule 23 in however way you want.

3             All right.  Just give me a moment.  Okay.

4    Fair enough.  I appreciate your presentations.

5             I know it's not easy being a pro se litigant.

6    I hope your experience was, you know, at least not

7    distressing.

8             Is there any other -- I think I've made your

9    last requested ruling, which is that the judges in this

10   situation ordering attorney's fees under Rule 23 are

11   acting in a judicial capacity, not an enforcement

12   capacity.

13            Is there any other finding or ruling that I

14   haven't made or neglected that anybody wants me to make?

15            (No response)

16            No?  All right.  We're adjourned.

17            (Conclusion of hearing 4:48 p.m.)

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.

Submitted: 11-18-19        /s/   Susan M. Bateman _____
                           SUSAN M. BATEMAN, LCR, RPR, CRR